FILED

SEP 0 3 2020

Clerk, U.S District Court
District Of Montana
Great Falls

MICHAEL A. KAKUK
Assistant U.S. Attorney
U.S. Attorney's Office
901 Front Street, Suite 1100
Helena, MT 59626
Phone:      (406) 457-5262
E-mail:     michael.kakuk@usdoj.gov

ROBYN N. PULLIO
Trial Attorney
Fraud Section, Criminal Division
U.S. Department of Justice
300 N. Los Angeles Street, Suite 2001
Los Angeles, CA 90012
Phone:      (202) 365-6897
Email:      robyn.pullio@usdoj.gov

ATTORNEYS FOR PLAINTIFF
UNITED STATES OF AMERICA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
### GREAT FALLS DIVISION

| UNITED STATES OF AMERICA, | CR 20-65-GF-BMM |
|---|---|
| Plaintiff, | INDICTMENT |
| vs. | CONSPIRACY TO COMMIT HEALTH CARE FRAUD (Count 1)<br>Title 18 U.S.C. § 1349<br>(Penalty: 10 years imprisonment, $250,000 fine) |
| JANAE NICHOLE HARPER, | |
| Defendant. | HEALTH CARE FRAUD (Counts 2-9)<br>Title 18 U.S.C. § 1347<br>Title 18 U.S.C. § 2(b)<br>(Penalty: 10 years imprisonment, $250,000 fine) |

|  | **CRIMINAL FORFEITURE**<br>**18 U.S.C. §§ 981(a)(1)(C), 982(a)(1),**<br>**982(a)(7), and 28 U.S.C. § 2461(c)** |
|---|---|

THE GRAND JURY CHARGES:

At all times material to this Indictment:

## COUNT 1
## CONSPIRACY TO COMMIT HEALTH CARE FRAUD
## 18 U.S.C. § 1349

### General Allegations

1. Defendant JANAE NICHOLE HARPER was a nurse practitioner enrolled in Medicare in the following states: Montana, Missouri, Nevada, South Carolina, and Wyoming. Defendant was a resident of Billings, Montana.

2. Willie McNeal IV was the owner, president, founder, chief executive officer, and registered agent of Integrated Support Plus, Inc. ("Integrated"), a purported telemedicine company located in Spring Hill, Florida, in addition to other companies (collectively, the "Integrated Support Network").

### The Medicare Program

3. The Medicare Program ("Medicare") was a federal health care program affecting commerce that provided benefits to individuals who were either 65 years of age and older, or disabled. The benefits available under Medicare were governed by federal statutes and regulations. The United States Department of Health and Human Services ("HHS"), through its agency the Centers for Medicare

2

and Medicaid Services ("CMS"), administered Medicare. Individuals who qualified for Medicare benefits were referred to as Medicare "beneficiaries."

4. Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

5. Physicians, nurse practitioners, and any other individual or company providing services to Medicare beneficiaries were referred to as Medicare "providers." To participate in Medicare, a provider was required to submit an application in which the provider agreed to comply with all Medicare-related laws and regulations, including, among other laws, the federal Anti-Kickback Statute. If Medicare approved a provider's application, the provider received a unique national provider number ("NPI"). This NPI was used for the processing and payment of all Medicare claims submitted by the enrolled provider.

6. Enrolled Medicare providers agreed to abide by the policies, procedures, rules, and regulations governing reimbursement, including, among other things, the federal Anti-Kickback Statute. Providers were given access to Medicare manuals and service bulletins describing proper billing procedures, rules, and regulations.

7. To receive payment from Medicare, providers submitted or caused the submission of claims to Medicare either directly, or through a billing company.

8. Those claims would be reviewed and processed by a Medicare Administrative Contractor ("MAC"), which was a company hired by Medicare for

specific geographic regions of the United States. A specific MAC would review the Medicare claim based on the region in which the benefits were purportedly provided.

### Durable Medical Equipment (DME)

9. Reusable orthotic devices such as rigid and semi-rigid braces for the knee, back, shoulder, and wrist (collectively, "braces") were a type of durable medical equipment ("DME"). "DME companies" were enrolled Medicare providers and would bill Medicare for providing braces to beneficiaries.

10. Under Medicare policies and rules with national scope, a Medicare claim for DME reimbursement was required to set forth, among other information, the beneficiary's name and unique Medicare identification number, the equipment provided to the beneficiary, the date the equipment was provided, the cost of the equipment, and the name and unique NPI of the medical practitioner who prescribed or ordered the equipment.

11. In the State of Montana, the Montana Board of Nursing would grant prescriptive authority to nurse practitioners which would allow them to prescribe DME to patients without oversight by a licensed physician.

12. Under Medicare policies and rules with national scope, Medicare would pay for DME or related health care benefits, items, or services only if they were reasonable and medically necessary, as determined and prescribed or ordered by a

4

licensed physician or other properly licensed and qualified health care provider, such as a nurse practitioner or physician assistant. Medicare would not pay for claims procured through kickbacks and bribes.

13. Specific DME and other health care services sometimes fell under a specific Local Coverage Determination ("LCD"), which was a decision made by a particular MAC for the region which the MAC oversaw. Past LCDs were in writing and applied to any future billing for that same equipment or service. All LCDs were published online for providers to review.

14. The LCD for Knee Orthoses (LCD L33318) applied nationally for equipment ordered or services performed after October 1, 2015. Under LCD L33318, prefabricated knee braces with codes L1833 or L1851, and others, were only medically necessary when knee instability was documented by a direct examination of the beneficiary which included an "objective description of joint laxity (e.g., varsus/valgus instability, anterior/posterior Drawer test)." Claims for those braces did not meet Medicare's criteria for reimbursement if only a beneficiary's claims of pain or "a subjective description of joint instability" were documented, as they were not reasonable or medically necessary based on the applicable LCDs.

## Telemedicine

15. Telemedicine provided a means of connecting patients to medical

professionals, including nurse practitioners, through telecommunications technology, such as the internet or telephone, to interact with a patient remotely.

16. Telemedicine companies provided telemedicine services to individuals by hiring health care providers such as doctors or nurse practitioners. Telemedicine companies typically provided remote communications technology for doctors and other health care providers to conduct consultations with patients for non-emergency medical conditions and determine the medically necessary treatment option, if any. Telemedicine companies typically paid health care providers a fee to conduct consultations with patients. To generate revenue, telemedicine companies would typically either bill insurance or offer a membership program to customers.

17. During the relevant time period, Medicare covered expenses for specified telemedicine services, but only if certain requirements were met. These requirements included that: (a) the beneficiary was located in a rural or health professional shortage area; (b) the services were delivered via an interactive audio and video telecommunications system; and (c) the beneficiary was at a practitioner's office or a specified medical facility—not at the beneficiary's home—during the telehealth consultation with a remote practitioner.

<u>The Conspiracy and Scheme to Defraud Medicare</u>

18. Telemarketing companies that ran call centers typically received

prepayments from numerous DME companies in exchange for a set number of completed brace orders, and other Medicare-required documents, signed by medical providers (collectively referred to as "brace prescriptions"). The DME companies would pay a fixed price to the telemarketing companies for each brace in a completed, signed brace prescription. The DME companies would use these brace prescriptions signed by medical providers to support claims for braces which they submitted to Medicare for reimbursement.

19. The telemarketing companies would make calls to, or receive calls from, Medicare beneficiaries. After determining that a Medicare beneficiary was eligible to receive one or more braces, the telemarketer would obtain medical information from the beneficiary to fill out the brace prescriptions.

20. The telemarketing companies would then send the completed, but unsigned, brace prescriptions to the Integrated Support Network, along with a payment, for the purpose of obtaining an enrolled Medicare provider's signature on the brace prescription.

21. The Integrated Support Network paid numerous enrolled Medicare providers, including doctors and nurse practitioners, to review and sign these brace prescriptions. Some of the enrolled Medicare providers were direct employees of the Integrated Support Network, while other providers were independent contractors for the Integrated Support Network working through third-party

7

medical staffing companies.

22. The enrolled Medicare providers who signed the brace prescriptions for the Integrated Support Network would often do so regardless of medical necessity, in the absence of a pre-existing medical provider-patient relationship, without a physical examination, and frequently based solely on a short telephonic conversation or with no interaction at all with beneficiaries.

23. The Integrated Support Network would send the signed brace prescriptions back to the telemarketing company. The telemarketing company, in turn, would send the signed brace prescriptions to the specific DME company which had prepaid the illegal kickback and bribe for it.

24. As part of this conspiracy and scheme to defraud Medicare, the Defendant worked for the Integrated Support Network and, pursuant to the prescriptive authority granted to her by the State of Montana, signed brace prescriptions without seeing—and frequently without talking to—Medicare beneficiaries, and without determining the medical necessity of the braces she prescribed.

### Object of the Conspiracy

25. From on or about November 28, 2017, and continuing through on or about July 16, 2019, in the District of Montana and elsewhere, defendant JANAE NICHOLE HARPER, together with Willie McNeal IV and others known and

8

unknown to the Grand Jury, knowingly combined, conspired, and agreed to commit health care fraud, in violation of Title 18, United States Code, 1347.

## Manner and Means of the Conspiracy

26. The object of the conspiracy was carried out, and to be carried out, in substance, as follows:

    a. Defendant falsely certified to Medicare that she would comply with all Medicare rules and regulations, including that she would not knowingly present or cause to be presented a false or fraudulent claim for payment to Medicare.

    b. Defendant agreed with Willie McNeal IV and others to work for the Integrated Support Network, both directly and indirectly through a medical staffing company. As part of her dealings with the Integrated Support Network, Defendant agreed to write brace orders for Medicare beneficiaries in exchange for approximately $30 per patient consultation, and to provide few, if any, medical treatment options for beneficiaries besides braces during the purported telemedicine consultations.

    c. Defendant gained access to Medicare beneficiary information for thousands of Medicare beneficiaries from the Integrated Support Network in order for Defendant to sign brace orders for those beneficiaries.

    d. Neither Defendant nor Integrated billed Medicare for telemedicine

consultations with beneficiaries, but instead, Willie McNeal IV and others solicited illegal kickbacks and bribes from brace suppliers for brace orders that were signed by Defendant and others.

e. Willie McNeal IV and others paid and caused payments to be made to Defendant and others to sign brace orders and cause the submission of brace claims to Medicare regardless of medical necessity, in order to increase revenue for themselves and their co-conspirators.

f. Defendant would sign these brace prescriptions for pre-selected braces for Medicare beneficiaries regardless of medical necessity, in the absence of a pre-existing medical provider-patient relationship, without a physical examination, and frequently based solely on a short telephonic conversation with the beneficiary or without any conversation with the beneficiary at all.

g. Defendant, Willie McNeal IV, and others falsified, fabricated, altered, and caused the falsification, fabrication, and alteration of patient files, brace orders, and other records, including by falsely certifying that Defendant had: (i) spoken with the Medicare beneficiaries, (ii) established a valid prescriber-patient relationship with the beneficiaries, and/or (iii) conducted various examinations and diagnostic tests that justified the medical necessity of prescribing braces to Medicare beneficiaries, all to

support claims to Medicare for braces that were obtained through illegal kickbacks and bribes, medically unnecessary, ineligible for Medicare reimbursement, and not provided as represented.

h. Defendant, Willie McNeal IV, and others concealed and disguised the scheme by preparing and causing to be prepared false and fraudulent documentation, and submitting or causing the submission of false and fraudulent documentation to Medicare, including documentation stating that Defendant conducted various diagnostic tests prior to ordering braces, when, in fact, Defendant rarely had a discussion or conversation with these Medicare beneficiaries and rarely conducted any diagnostic tests.

i. Between on or about November 28, 2017, and continuing through on or about July 16, 2019, Defendant and others submitted and caused the submission of approximately $8,259,849 in false and fraudulent claims to Medicare for braces prescribed by Defendant which were not medically necessary, not eligible for reimbursement, and not provided as represented, of which Medicare paid approximately $4,307,934.

**COUNTS 2-9**
**HEALTH CARE FRAUD**
**18 U.S.C. § 1347**
**18 U.S.C. § 2(b)**

27. The Grand Jury incorporates by reference and re-alleges paragraphs 1-24 above as though set forth in their entirety here.

## The Fraudulent Scheme

28. From on or about November 28, 2017, and continuing through at least on or about July 16, 2019, in the District of Montana, and elsewhere, defendant JANAE NICHOLE HARPER, together with Willie McNeal IV and others known and unknown to the Grand Jury, knowingly, willfully, and with intent to defraud, executed, and attempted to execute, a scheme and artifice: (a) to defraud a health care benefit program, namely, Medicare, as to material matters in connection with the delivery of and payment for health care benefits, items, and services; and (b) to obtain money from Medicare by means of materially false and fraudulent pretenses and representations and the concealment of material facts in connection with the delivery of and payment for health care benefits, items, and services.

## Means to Accomplish the Fraudulent Scheme

29. The fraudulent scheme operated, in substance, as described in paragraph 26 of this Indictment, which is hereby incorporated by reference as if stated in its entirety here.

## Executions of the Fraudulent Scheme

30. On or about the dates set forth below, within the District of Montana, and elsewhere, defendant JANAE NICHOLE HARPER, together with Willie McNeal IV and others known and unknown to the Grand Jury, for the purpose of executing and attempting to execute the fraudulent scheme described above,

knowingly and willfully submitted and caused to be submitted to Medicare for payment the following false and fraudulent claims seeking the following dollar amounts, which claims falsely represented that braces prescribed to beneficiaries by the Defendant were medically necessary when, in fact, Defendant had not spoken, or spoke only briefly, with the Medicare beneficiary, had not established a valid prescriber-patient relationship with the Medicare beneficiary, and/or had not conducted various examinations or diagnostic tests of the Medicare beneficiary to justify the medical necessity of prescribing the following braces:

| Count | Medicare Beneficiary | Medicare Claim Number | Approx. Date Submitted | Brace Type | Approx. Amount Billed |
|---|---|---|---|---|---|
| 2 | Beneficiary 1 | 118213804154000 | August 1, 2018 | Back | $1,703.13 |
| 3 | Beneficiary 1 | 118213804155000 | August 1, 2018 | Knee | $939.37 |
| 4 | Beneficiary 1 | 118213804156000 | August 1, 2018 | Shoulder | $934.74 |
| 5 | Beneficiary 2 | 119017808413000 | January 17, 2019 | Back | $1,500.00 |
| 6 | Beneficiary 2 | 119017808415000 | January 17, 2019 | Knee | $1,043.44 |
| 7 | Beneficiary 3 | 119032800086000 | February 1, 2019 | Back | $1,107.25 |
| 8 | Beneficiary 3 | 119032800086000 | February 1, 2019 | Knee | $957.91 |
| 9 | Beneficiary 3 | 119038823691000 | February 7, 2019 | Shoulder | $710.10 |

**FORFEITURE ALLEGATION**
**18 U.S.C. §§ 981(a)(1)(C) and 982(a)(7); 28 U.S.C. § 2461(c)**

31. Pursuant to Rule 32.2(a) Fed. R. Crim. P., notice is hereby given to defendant JANAE NICHOLE HARPER that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(7), and Title 28, United States Code, Section 2461(c), in

13

the event of Defendant's conviction under any of the Counts 1-9 of this Indictment.

32. Defendant shall forfeit to the United States the following property:

    a. All right, title, and interest in any and all property, real or personal, that constitutes or is derived, directly or indirectly, from the gross proceeds traceable to the commission of any offense set forth in any of Counts 1-9 of this Indictment; and/or

    b. A sum of money equal to the total value of the property described in subparagraph a.

33. If any of the property described above, as a result of any act or omission of the Defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with a third party;

    c. has been placed beyond the jurisdiction of the court;

    d. has been substantially diminished in value; or

    e. has been co-mingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1) and Title 28, United States Code, Section 2461(c).

A TRUE BILL.

FOREPERSON _/s/_

_____ for
KURT G. ALME
United States Attorney

_____ (for)
JOSEPH E. THAGGARD
Criminal Chief Assistant U.S. Attorney

ROBERT ZINK
Chief, Fraud Section
United States Department of Justice

ALLAN J. MEDINA
Deputy Chief, Fraud Section
United States Department of Justice

NIALL M. O'DONNELL
Assistant Chief, Fraud Section
United States Department of Justice

ROBYN N. PULLIO
Trial Attorney, Fraud Section
United States Department of Justice